UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| KAREN MORGAN, | ) | |
|---|---|---|
| Plaintiff, | ) ) ) | |
| v. | ) ) | No. 3:15-cv-00919 Chief Judge Crenshaw |
| TRIUMPH AEROSTRUCTURES, LLC, | ) ) ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION**

Pending before the Court in this employment discrimination case is the Renewed Motion for Summary Judgment (Doc. No. 65) filed by Triumph Aerostructures, LLC ("Triumph"), to which Karen Morgan ("Morgan") has responded in opposition (Doc. No. 70), and Triumph has replied (Doc. No. 73). For the reasons that follow, the Motion will be granted, and Morgan's claims will be dismissed.

**I. Factual Background[1]**

On October 24, 2005, Vought Aircraft Industries, Inc. hired Morgan as an Aircraft Assembler, and she kept that job when Triumph acquired Vought. (DSOF ¶¶ 1, 2). In December 2013, Morgan applied for, and received, a promotion to an Aircraft Inspector position, and was assigned to the production line for the C-130, a military aircraft. (Id. ¶¶ 4, 9).

---

[1] The following facts are drawn from Triumph's Statement of Facts and Morgan's responses thereto, ("DSOF", Doc. No. 71), and from Morgan's Statement of Additional Facts and Triumph's response thereto, ("PSOF", Doc. No. 74). Unfortunately, these statement are unclear as to some of the operative dates and where Morgan was working when certain incidents occurred. In an effort to clarify and better understand the summary judgment record, the Court has read all of the submitted transcripts, not just the excerpts cited by the parties. What follows is a roughly chronological presentation of the facts underlying Morgan's claims.

1

As the name suggests, an Aircraft Inspector inspects aircraft parts that have been built by assemblers. If a deflect or flaw is observed in the part, the Inspector has authority to send the part back to assembly for correction. (Id. ¶¶ 7, 8).

When Morgan began working as an Inspector on the C-130 line, Christopher Criss ("Criss"), a subassembly supervisor, screamed at her for rejecting parts, and later became angry with her for buying (or approving) parts. (Id. ¶¶ 24, 25).[2] Even though Criss screamed and yelled, Morgan does not recall him ever using any slurs or derogatory words against her. She believes, however, that Criss was trying to intimidate her to go against company policy and use defective parts. (PSOF ¶ 1).

In January 2014, Morgan moved from subassembly to major assembly, where she was supervised by Don Cuozzo ("Cuozzo"). (DSOF ¶¶ 32, 34). Cuozzo believed Morgan was responsible for a missing part and required her to look for it. That turned out to be a misunderstanding because Criss had taken the part to a meeting with supervisors and the plant manager. (Id. ¶¶ 34, 36-38). Although Morgan was not present at the meeting, she claims Criss threw the part on the table and said he "wanted something done about" Morgan because the part was defective and she had approved it. (Id. ¶¶ 39-40). Later, Cuozzo took Morgan aside and told her that he had received a complaint about her from Criss, who "wanted something done" because Morgan had approved the defective part. (Id. ¶ 40)

Criss's action prompted Morgan to contact Valerie Jordan-Taylor, a Human Resources Generalist for Triumph. At a meeting on January 16, 2014, Morgan told Valerie-Jordan "everything that had happened to that point," including that Criss was upset about Morgan approving a part, even

---

[2] Prior to becoming an Inspector, Morgan had worked with Criss, and described him as "fine." (Id. ¶ 26).

though Morgan thought the part was good. (Id. ¶ 43). Morgan does not recall telling Jordan-Taylor that any slurs or offensive language had been used toward her by Criss, but wanted an apology from Criss, and an acknowledgment that he had acted unprofessionally. (Id. ¶¶ 47).

> After the meeting, Jordan-Taylor prepared a written summary that, in part, reads:
>
> Karen stated to me that Chris Criss screamed at her; said that everyone time [sic] the department got a new inspector they "had to go through this," that Karen was being too picky. Karen stated that she knew Chris Criss was mad when he approached her and she felt the environment around her was a little hostile. Karen stated that she is new to the program; she doesn't stamp off parts on her own yet; another inspector or her supervisor checks her work.
>
> Karen also felt that Chris Criss had complained about her to other employees. Someone told Karen that Criss had wrote an e-mail to Ron White complaining about her and Karen felt that if that was true, she wanted to know what the e-mail said because she doesn't appreciate Criss making slanderous comments about her.
>
> I explained to Karen that I would talk with Chris Criss regarding his behavior. I also told Karen that if she had encounters of this type, she should inform the person that they needed to talk with her supervisor and then to just walk away from the situation.

(Id. ¶ 46).

> Jordan-Taylor also spoke to Criss, summarizing their conversations as follows:
>
> I talked with Criss about the situation. He stated to me that they always have these problems with new inspectors. Criss felt like Karen should not have gotten the inspector job; that she wasn't qualified to do it. I explained to him that per the contract she was qualified to do the job and currently was in training. I asked Criss to be a little more conscious of his actions and words toward Karen and to give her the opportunity to learn the job. I also explained that if he had problems with her inspection of his parts he should take them up with Karen's supervisor until Karen has completed all her training.

(Id. ¶ 48). She also summarized a conversation with Chris Ray ("Ray), whom Morgan had identified as a witness:

> I talked with Chris Ray regarding Chris Criss' actions toward Karen Morgan. C. Ray commented that he felt Chris Criss handled the situation in the wrong way. Ray stated

3

> that Criss was mad because the earlier part had not been approved but the second part had. Ray stated everyone knows how Criss can talk and he could have approached Karen in a different way. Ray stated that Criss can sound like he was yelling when he is adamant about something. C. Ray felt like Karen was taking Criss words a little strongly.

(Id. ¶ 49).

Jordan-Taylor claims that, after talking to the involved parties, her "assessment was that Morgan was a new Inspector and Morgan did not understand everything about the position." (Id. ¶ 52). She claims to have told Criss to be more patient with Morgan, give her more direction, and show more understanding because Morgan was new to the job of Inspector. (Id. ¶ 53).

Jordan-Taylor then followed-up with Morgan the following week and checked-in with her on a monthly basis thereafter to see if the problem was resolved. Morgan reported no further problems with Criss. (Id.).

Morgan's conversation with Jordan Taylor occurred around the time that Morgan moved from subassembly to major assembly. While working in the major assembly area on the C-130 line, Cuozzo mistakenly thought that Morgan had missed an inspection call. When discussing the supposed missed call with her, Cuozzo did not make any derogatory comments about women. He did, however, tell Morgan "every morning" thereafter not to miss calls, and laughed. (Id. ¶ 55-56).

Also while working in Cuozzo's area, Randy Cox ("Cox"), the lead inspector on the C-130 told Morgan that he was "burned out," and that he was tired of answering questions from new employees. (Id. ¶ 57). Cuozzo then told Morgan to direct her questions to him, instead of Cox. Although Morgan thought she was being singled out, she did not ask other inspectors whether they, too, had similarly been instructed to ask Cuozzo questions, instead of Cox. (Id. ¶ 58).

In May 2014, Morgan was still on the C-130 line when Anthony Booker, a mechanic, told

4

her to "get off the jig"³ because she did not belong there. (Id. ¶ 61). Booker did not explain what he meant by her not belonging, but he stood in her way so that she could not walk down the stairs and off the jig.⁴

Morgan reported the incident to Jordan-Taylor, who told Morgan that she would talk with Booker. Morgan admits that, after speaking with Jordan-Taylor, "it was better," and admits that she has not had any further issues with Booker. (Id. ¶¶ 67-68).

When Cuozzo was not at work, Randy Vaughter ("Vaughter") filled in as the supervisor. On June 5, 2014, he showed Morgan a picture of a panel with bolts missing that should not have been approved. Because Morgan was not the one who approved the panel, she replied, "okay, I will keep an eye out on that so that it doesn't happen again." (Id. ¶ 71). Vaughter did not use any derogatory language or call Morgan names when he confronted her with the picture of the panel. Nevertheless, Morgan took exception to the comment because Vaughter was suggesting she had made a mistake, when, in fact, she had not. (Id. ¶¶ 72-73).⁵

By June 2014, Morgan had transferred to the second shift, where she was supervised by Rick Angel (Angel"). Morgan describe her working relationship with Angel as being "great." (DSOF ¶ 82). Whenever Morgan had a problem, she reported it to Angel who then took care of the matter. For example, on June 17, 2014, Morgan was asked to close out an order for a panel that was not part of her inspection area. When Morgan told Angel about the instruction, he told Morgan he would

---

³ A "jig" is used to hold the aircraft while it is being assembled. (Id. ¶ 62).

⁴ In her deposition, Morgan testified that Booker was loud, rude with other employees, "always angry," and would, "on occasion . . . just go off." (Doc. No. 68-1, Morgan Depo. at 68-69).

⁵ On at least three different occasions while working as an inspector, Morgan was called on to fix mistakes that she was not responsible for. (PSOF ¶ 7).

5

take care of it and for her to forward all of her emails to him so he could filter them. Morgan understood Angel's directive to be an effort to help her, and did not take issue with him asking her to forward the emails. (Id. ¶ 86).

While working the second shift, Morgan would sometimes find parts for her to tag when she arrived at work. She did not have a problem with being asked to tag the parts, but she took exception when Cuozzo left parts in her chair and covered them with masking tape, believing this was hostile because "it's not the way you do things." (Id. ¶ 89). He, and others, would also occasionally tape her table with masking tape, and Cuozzo would sometimes leave signs that read, "do not touch." (PSOF ¶ 8).

Morgan also claims that Cuozzo treated her differently than male employees because he stood outside the restroom with his arms crossed when she took too long in the restroom, and would give her dirty looks. (Id. ¶ 96). Morgan would also "get talked to" by Don Cuozzo for leaving her work area without permission, while male employees left for extended periods but were not questioned. (Id. ¶ 99).

Morgan's primary issues, however, appear to be with Ray, a fellow Inspector. In her Statement of Facts, she quoted the following language from her deposition to demonstrate how Ray allegedly harassed her:

> He will stand at Randy Cox's desk, which I sit next to, and stare at my computer to see what I'm doing. And he used to do that on the C130. He would stand behind me. And I would turn around, and he would be looking at my computer screen to see what I was doing. And numerous people would tell me that he was watching me. And I said, why do you think that? And they said, Well, I've seen him behind some – the parts racking going like this and just trying to see where you are at. And he goes upstairs to the bathroom, and he looks down to see where you're at. And he – he watches me. He goes on my calls. I clock in on a job, and he – I guess - well, I could tell you the date was last Friday. I went on three calls. And he – the machines tell me, Chris Ray got it. So he goes on my calls. When I clock in on a call, he'll go

over. He'll look at the job. By the time I get over there, they tell me – because his desk is farther down the line. And he's in position three, and I'm in position five way down there. So here I come. Oh, Chris Ray got it. He alters my tags when I'm present in the plant. He walks aggressively toward me. The mechanics – well, he'll tell my supervisor that I omitted soothing in MES and have my supervisor come to my desk and tell me. And when I complain about him micromanaging my tags and going on my calls, the supervisor said he is a mother hen. That's what he calls it. He's my – he's not my lead or my supervisor, so he shouldn't be scrutinizing my work.

(PSOF ¶ 9; Doc. No. 68-1, Pf. Depo. at 93-94). In short, Morgan believes that Ray is "aggressive," and "a problem . . . in every possible way." (DSOF ¶ 44). He screamed obscenities at her across the hanger, threw things, slammed things down on her desk, sat at her desk, and moved things on her desk to agitate her. (PSOF ¶ 10).

Morgan also had a run-in with Ray in the parking lot at work. According to Derrell Bowden ("Bowden"), a Human Resources Generalist, Morgan called him from the parking lot, saying that she had been approached by Ray and wanted to be escorted into the building. (DSOF ¶ 121). Bowden obliged and, according to him, Morgan stated that Ray said he wanted to apologize to her, but she did not want to have any contact with him and only wanted to deal with him on a professional level. (Id. ¶ 122; Doc. No. 68-16, Bowden Depo. at 16-17). Bowden asserts that he then spoke with Ray who said he was trying to apologize. Bowden told Ray that Morgan did not want an apology and wanted Ray to stay away from her. (Id. ¶ 123).[6]

Morgan concedes that Ray was not just rude to her. She testified that he is "constantly

---

[6] It is unclear from the record when this occurred. According to the deposition testimony of Tammy Noble ("Noble"), another Inspector, the incident happened sometime around April 2016. Noble also testified that, around that same time, she overheard a telephone conversation between Ray and Cox in which Ray said that he was going to meet Morgan in the parking lot, and it "isn't going to be good." (Doc. No. 68-17, Noble Depo. at 22). She also claims that Ray called Morgan a "F-ing B" during the phone call. (Id. at 24-26). While Morgan cites Noble's deposition for the proposition that Bowden was aware of the telephone conversation, Noble did not indicate when Bowden became aware of the call. (Id. at 24-25).

7

screaming on his phone," "talks in the meeting in the morning about people not working or doing their jobs," and would use derogatory words when interacting with other people. (DSOF ¶¶ 73, 76). Morgan also claims that Ray sometimes said in reference to Angela Crissup ("Crissup"),[7] another Inspector, "that stupid bitch didn't do anything again last night." (Id. ¶ 78). Morgan "believes" Ray has referred to her as a "stupid bitch," but he never did so to her face. (Id. ¶ 80). She also claims that she was also told by mechanics that Ray would walk around and tell them that Morgan did not do anything at night. Morgan further alleges she was once told by Mark Hale, a mechanic, that "they" were compiling a book of every mistake she had made, and that Ray was trying to find a way to get her terminated. (Doc. No. 68-1, Pf. Depo. at 106).

Other employees also expressed dislike for Ray. In December 2016, Cox, Noble, and two other employees met with Bowden to complain about Ray. Noble describe Ray as being "rude," "arrogant," "loud," "colorful," and full of himself. (Id. ¶ 125). Cox disliked working with Ray so much that he stepped down from his role as a supervisor so that he would not have to deal with him anymore. (Id. ¶ 126). All four employees indicated that they did not like even being the same area with Ray because of his attitude and behavior. (Id. ¶ 127).

At some point in 2016, Ray was moved to the "Airbus" program, while Morgan remained working on the Gulfstream G650. These programs are 200 yards apart and in different parts of Triumph's plant. As a consequence. she and Mr. Ray no longer work in the vicinity of one another. (Id. ¶ 129).

On the G650 line, Morgan is supervised by David Ellis ("Ellis"). She has characterized him

---

[7] Crissup worked on the second shift. In her deposition, she testified that, during the 4½ years she worked at Triumph she did not have an issue with Ray or feel that he was trying to intimidate her. She also testified that she never observed anyone being harassed or treated differently during her employment at Triumph. (Id. ¶¶ 109-111).

8

as "great" and their relationship as "fine" because he treats her with respect and has never yelled at her or called her names. (DSOF ¶¶ 10-11, 113). Nevertheless, Morgan feels that Ellis retaliated against her because, after she claimed that Ray had put torque paint on a part that he did not witness torqued, Ellis printed off her clock-ins and inspection approvals for the day and reviewed them with her. (Id. ¶¶ 114-117).

Morgan still works at Triumph. During her employment, she was not demoted, nor did she miss a scheduled pay raise. (Id. ¶¶ 101). She never received discipline in the form of a formal write-up. (Id. ¶ 102). Further, Morgan does not recall anyone at Triumph using words that were sexually demeaning towards her, nor does she recall anyone telling her that they do not want women working for Triumph. (Id. ¶¶ 105-106).[8] In fact, according to Jordan-Taylor, almost half of the Inspectors that worked in Morgan's area on the C-130 were female. (Id. ¶¶ 107).[9]

Based on the foregoing, Morgan brings claims for sex discrimination and retaliation. She also contends that she was subjected to a hostile work environment.

## II. Standard of Review

The standard of review for Motions for Summary Judgment has been aptly summarized by the Sixth Circuit as follows:

---

[8] Despite Morgan's deposition testimony that she did not recall Ray using sexually derogatory terms towards her (Doc. No. 68-1, Pf. Depo. at 100), and her admission in response to Triumph's statement of facts that she "does not recall anyone using words that are sexually demeaning towards her" (DSOF ¶ 105), Morgan claims in her own statement of facts that "Ray has called Ms. Morgan 'bitch' and 'whore' directly to her," (PSOF 11). The sole support for this assertion, however, is not Morgan's own testimony, but Nobel's deposition testimony. Regardless, and despite Triumph's anti-discrimination policy, Nobel did not report these alleged statements to any supervisors, (Doc. No. 68-17, Noble Depo. at 17), nor did Morgan for that matter.

[9] Morgan disputes this fact. However, the only basis for her dispute is Noble's statement in her deposition that she "work[s] in a man's world," and that "[w]omen are a minority." (Doc. No. 68-17, Noble Depo. at 14). The fact that aviation may be a "man's world" obviously does not mean that women do not represent almost half of the inspectors on the C-130.

9

> Summary judgment should be rendered "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ .P. 56(a). The reviewing court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor. White v. Baxter Healthcare Corp., 533 F.3d 381, 390 (6th Cir.2008). Not just any alleged factual dispute between the parties will defeat an otherwise properly supported motion for summary judgment; the dispute must present a genuine dispute of material fact. Id. A dispute is "genuine" only if based on evidence upon which a reasonable jury could return a verdict in favor of the non-moving party. Niemi v. NHK Spring Co., Ltd., 543 F.3d 294, 298 (6th Cir.2008). A factual dispute concerns a "material" fact only if its resolution might affect the outcome of the suit under the governing substantive law. Id. at 298–99.

Rogers v. O'Donnell, 737 F.3d 1026, 1030 (6th Cir. 2013). Based on those standards, it is clear that Triumph is entitled summary judgment on all of Morgan's claims.

### III. Legal Analysis

Morgan's claims for sex discrimination, retaliation, and a hostile work environment are brought under both Title VII, 42 U.S.C. § 2000e *et seq.*, and the Tennessee Human Rights Act ("THRA"), Tenn. Code Ann. § 4-21-101, *et seq.* Because the Tennessee "legislature intended the THRA to be coextensive with federal law," Phillips v. Interstate Hotels Corp., 974 S.W.2d 680, 683 (Tenn. 1998), such "claims are analyzed in the same manner as claims brought under Title VII of the Civil Rights Act of 1964," Marpaka v. Hefner, 289 S.W.3d 308, 313 (Tenn. Ct. App. 2008) (collecting cases). This includes, where applicable, the McDonnell Douglas v. Green, 411 U.S. 792 (1973) burden-shifting framework that the Tennessee legislature codified for all claims filed after June 10, 2010. Tenn. Code Ann. § 4–21–311 (2011).

### A. Sex Discrimination and Retaliation

Where, as here, there is no direct evidence of sex discrimination or retaliation, a plaintiff may establish her claim using the burden shifting paradigm set forth in McDonnell Douglas. To start, the plaintiff must establish a *prima facie* case, which, in the context of sex discrimination, requires

showing that "(1) she is a member of a protected group; (2) she was subjected to an adverse employment decision; (3) she was qualified for the position; and (4) she was replaced by a person outside the protected class, or similarly situated non-protected employees were treated more favorably." Grace v. USCAR, 521 F.3d 655, 677 (6th Cir. 2008) (citing Peltier v. United States, 388 F.3d 984, 987 (6th Cir.2004)). "To establish a prima facie case of retaliation under Title VII, Plaintiff must demonstrate that: '(1) [s]he engaged in activity protected by Title VII; (2) h[er] exercise of such protected activity was known by the defendant; (3) thereafter, the defendant took an action that was materially adverse to the plaintiff; and (4) a causal connection existed between the protected activity and the materially adverse action.'" Laster v. City of Kalamazoo, 746 F.3d 714, 730 (6th Cir. 2014) (quoting Jones v. Johanns, 264 F. App'x 463, 466 (6th Cir. 2007)).

"Once a plaintiff satisfies her *prima facie* burden, the burden of production shifts to the employer to articulate a legitimate nondiscriminatory reason for the adverse employment action." Schoonmaker v. Spartan Graphics Leasing, LLC, 595 F.3d 261, 264 (6th Cir. 2010) ; Allen v. Highlands Hosp. Corp., 545 F.3d 387, 394 (6th Cir.2008). "If the employer meets this burden, the burden of production shifts back to the plaintiff to show that the employer's explanation was a mere pretext for intentional . . . discrimination." Id.

Even though "[t]he elements of a retaliation claim are similar but distinct from those of a discrimination claim," Laster, 746 F.3d at 730 (6th Cir. 2014),[10] they are the same insofar as they require a plaintiff to show that she suffered an adverse employment action as a part of her *prima facie* case. It is here that Morgan's sex discrimination and retaliation claims fail.

---

[10] Most notably, under both Title VII and the THRA, retaliation claims, unlike discrimination claims, require a showing of "but-for" causation, *i.e.*, that the retaliation would not have occurred in the absence of the wrongful action by the employer. Univ. of Texas Sw. Med. Ctr. v. Nassar, 133 S. Ct. 2517, 2533 (2013) (Title VII); Goree v. United Parcel Serv., Inc., 490 S.W.3d 413, 440 (Tenn. Ct. App. 2015) (THRA).

An adverse employment action is "a materially adverse change in the terms of . . . employment." Kocsis v. Multi–Care Management, Inc., 97 F.3d 876, 885 (6th Cir. 1996). "Termination, decrease in wage or salary, change in title, diminished material responsibilities, or a material loss of benefits are all examples of a materially adverse change." Mensah v. Michigan Dept. of Corrections, 621 F. App'x 332, 334 (6th Cir. 2015).

With respect to her sex discrimination claim, Morgan asserts that she was subjected to adverse employment actions when Cuozzo "stood outside the restroom with his arms crossed" and made faces because he believed she took too long, and that she "would get talked to" by Cuozzo for leaving the area without permission, while male employees were not. (Doc. No. 70 at 5). She also claims that the same actions support her retaliation claim, coupled with the fact that Ellis went over her clock-ins and inspection approvals after she complained about Ray painting torque nuts that he had not inspected. None of these things rises to the level of an adverse employment action within the meaning of Title VII or the THRA.

Monitoring bathroom breaks is not an adverse employment action. See Fornah v. Cargo Airport Servs., LLC, 2014 WL 25570, at *11 (E.D.N.Y. Jan. 2, 2014) (discrimination claim failed where plaintiff failed to provide evidence that "scrutiny of her bathroom breaks r[ose] to the level of an adverse employment action" or that "any disciplinary measure, let alone ultimate employment decisions, happened in relation to [that] scrutiny"); Eberhardt v. First Centrum, LLC, 2007 WL 518896, at *6 (E.D. Mich. 2007) (finding that a policy of "shorter restroom breaks . . . does not fall along the lines of" a materially-adverse employment action); Johnson v. Olin Corp., 2000 WL 1468480, at *11 (S.D. Ind. Sept. 29, 2000) (stating that restrictions in time and length of plaintiff's bathroom use did not amount to adverse employment action); Koschoff v. Runyon, 1999 WL

907546, at *12 (E.D. Pa. Oct. 7, 1999) (finding that "litany of allegations" including "requiring permission to use the bathroom, and being criticized for taking to many bathroom visits" did not rise to the level of an adverse employment action"). Nor is receiving dirty looks from a co-worker or supervisor an adverse employment action. See Harris v. Firstar Bank Milwaukee, N.A., 97 F. App'x 662, 664 (7th Cir. 2004) (stating that intimidating comments, dirty looks and scrutiny are not adverse employment actions); King v. Rosek Co., 2013 WL 149777, at *1 n.5 (D. Colo. Jan. 14, 2013) (stating that "receiving dirty looks from management" was not an adverse employment action because it "effected no change to Plaintiff's employment status"); Caroline Zuno v. Catholic Bishop of Chicago, 2008 WL 4876934, at *5 (N.D. Ill. Aug. 6, 2008) (stating that "glaring or dirty looks . . . clearly do not rise to the level of an adverse employment action").

Likewise, "[i]ncreased surveillance and discipline, whether warranted or not, do not constitute a material adverse change in the terms of employment in the discrimination context because those actions do not 'constitute[ ] a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" Lee v. Cleveland Clinic Found., 676 F. App'x 488, 494 (6th Cir. 2017) (quoting White v. Baxter Healthcare Corp., 533 F.3d 381, 402 (6th Cir. 2008)); see, Birch v. Cuyahoga Cty. Prob. Court, 392 F.3d 151, 169 (6th Cir. 2004) (stating that an "increased scrutiny of work" is "not tantamount" to an adverse employment action). This would include Cuozzo allegedly requiring Morgan to account for her time away from the line, and Ellis's review of the clock-ins and inspection approvals.[11]

---

[11] In fairness to Ellis, it appears from Morgan's deposition testimony that he undertook the review primarily to show that Morgan may not have been present when Ray witnessed the bolts being torqued. (Doc. No. 68-1, Pf. Depo. at 102-104). Thus, Ellis's "alleged 'nitpicking' of [Morgan] could not qualify as an adverse action because this harassment, by itself, amounts to little more than the kind of petty annoyances

13

"Without an adverse employment action on which to build her case, [Morgan's] discrimination [and retaliation] claims fail as a matter of law." Worthy v. Materials Processing, Inc., 433 F. App'x 374, 376 (6th Cir. 2011). Accordingly, Triumph is entitled to summary judgment on those claims.[12]

**B. Hostile Work Environment**

In order to succeed on a Title VII hostile-work-environment claim, a plaintiff must demonstrate that:

> (1) she belonged to a protected group, (2) she was subject to unwelcome harassment, (3) the harassment was based on [her protected status], (4) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment, and (5) the defendant knew or should have known about the harassment and failed to act.

Williams v. CSX Transp. Co., 643 F.3d 502, 511 (6th Cir. 2011). The same elements are required to prove a hostile work environment claim under the THRA. Bazemore v. Performance Food Grp., Inc., 478 S.W.3d 628, 636 (Tenn. Ct. App. 2015). Whether considered to be based upon sex or in retaliation for having complained about discrimination, Morgan's hostile work environment claims fail for at least three reasons.

First, Morgan has failed to show that many of the actions about which she complains were

---

with which countless employees are expected to deal." Hill v. Nicholson, 383 F. App'x 503, 513 (6th Cir. 2010); see Poppy v. City of Wiloughby Hills, 96 F. App'x 292, 295 (6th Cir. 2004) (finding that supervisor "reviewing [plaintiff's] time sheets, requesting keys to her office to inspect records kept there, or installing a security camera in the hall outside her office" not adverse employment actions).

[12] With respect to Morgan's sex discrimination claim, Triumph argues that it fails for the additional reason that she has not shown that others were treated more favorably as required by the fourth element of a *prima facie* case. This argument neglects to consider Morgan's overriding contention that all of the males were treated better than she was. Regardless, to the extent Morgan cannot show that others were treated more favorably, this is more a function of the incorporeal nature of many of the employment actions about which she complains. It is one thing to be able to point to others who were not demoted, not transferred, not fired, or not docked pay. It is quite another to show that others were not subjected to seemingly disapproving facial expressions and body language.

14

based on that fact that she is a women, or that she complained about unlawful treatment. At a minimum, these would include: (1) Criss yelling at Morgan when he disagreed with her decisions to approve or reject parts during inspections; (2) Cuozzo requiring Morgan to search for a part, blaming her for the missing part, telling her to not miss inspection calls, instructing her to direct questions to him when Cox claimed to be burned out, and leaving parts in her chair; (3) Vaughter showing Morgan the picture of a panel that was approved, even though it had bolts missing, and suggesting she was responsible for the mistake; (4) Ray screaming on the phone and at other employees, throwing things when upset with others, and complaining about other employees; and (5) supervisors telling Morgan on three occasions to fix mistakes that were not hers.

Second, the conduct about which Morgan complains was not severe or persuasive within the meaning of Title VII or the THRA. In determining whether conduct is severe or pervasive, a court is to consider the "totality of the circumstances," utilizing both an objective and subjective test. Clay v. United Parcel Serv., Inc., 501 F.3d 695, 707 (6th Cir.2007) (citation omitted); Williams v. General Motors, 187 F.3d 553, 562 (6th Cir.1999). "[I]n other words, the conduct must be so severe or pervasive as to constitute a hostile or abusive working environment both to the reasonable person and the actual victim." Randolph v. Ohio Dept. of Youth Serv's, 453 F.3d 724, 733 (6th Cir.2006). Factors to be considered include "'the frequency of the discriminatory conduct; its severity; whether it [was] physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfere[d] with an employee's performance.'" Id. (quoting, Harris, 510 U.S. at 23).

Here, and assuming the conduct was sufficiently frequent, even though many of Morgan's complaints involved an assessment of how others viewed her work, the conduct at issue was not severe or physically threatening. Rather, the bulk of the conduct included offensive utterances,

15

workplace spats, and personal conflicts. However, Title VII is not "a general civility code for the American workplace," Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998), and "petty slights or minor annoyances that often take place at work and that all employees experience" are insufficient to establish a hostile work environment claim, Burlington Northern & Santa Fe Railway Company v. White, 548 U.S. 53, 58 (2006).

Further, "[p]ersonal conflict does not equate with discriminatory animus," Morris v. Oldham Cty. Fiscal Court, 201 F.3d 784, 789 (6th Cir. 2000) (citation omitted), and a distinction must be made "between lawful conduct–even if insensitive–and discriminatory harassment," Vitt v. City of Cincinnati, 97 F. App'x 634, 638 (6th Cir. 2004) (citation omitted). Thus, "the conduct of jerks, bullies, and persecutors is simply not actionable under Title VII unless they are acting because of the victim's gender," Wasek v. Arrow Energy Servs., Inc., 682 F.3d 463, 467 (6th Cir. 2012), or in retaliation for the recipient having engaged in protected conduct. This is because "[t]he touchstone of any hostile work environment claim . . . is whether 'the workplace is permeated with discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" Khamati v. Sec'y of Dep't of the Treasury, 557 F. App'x 434, 443 (6th Cir. 2014) (quoting Harris, 510 U.S. at 23).

Third, even if Morgan could show a workplace permeated with discriminatory intimidation, ridicule and insult, her hostile work environment claim fails because she has not shown a basis for holding Triumph liable. Under the Supreme Court's decisions in Faragher v. City of Boca Raton, 524 U.S. 775, 807 (1998) and Burlington Industries Inc. v. Ellerth, 524 U.S. 742, 765 (1998), (collectively "Faragher/Ellerth"), liability may be imposed on an employer where a supervisor

16

engages in workplace harassment that leads to a tangible employment action. Liability may also be imposed where the employer fails to exercise reasonable care to prevent and correct known harassment by a co-worker, or by a supervisor under the same circumstances when there has been no tangible employment action. Gallagher v. C.H. Robinson Worldwide, Inc., 567 F.3d 263, 275 (6th Cir. 2009).

Faragher/Ellerth constitutes an affirmative defense,[13] and is established when the employer shows that [1] it "exercised reasonable care to prevent and correct promptly any sexually harassing behavior"; and (2) "plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." Thornton v. Fed. Express Corp., 530 F.3d 451, 456 (6th Cir. 2008) (citing, Faragher, 524 U.S. at 807; Ellerth, 524 U.S. at 765). "Generally, an employer satisfies the first part of this two-part standard when it has promulgated and enforced [an anti-] harassment policy." Id.

Here, it is undisputed that Triumph has an Equal Employment Opportunity Policy set forth in the Employee Handbook that prohibits discrimination, and that the hourly employees are governed by the terms of a Collective Bargaining Agreement with the International Association of Machinists and Aerospace Workers that also prohibits discrimination. (DSOF ¶¶ 14-17). It is also undisputed that Triumph provides discrimination and harassment training to its employees and that employees

---

[13] Without citation to any authority, Morgan argues that "Defendant's assertion of this defense in a motion for summary judgment is inappropriate" because it "is governed by a preponderance of the evidence standard." (Doc. No. 70 at 12). This theory, however, would preclude summary judgment in the vast majority of cases because most civil claims are required to be proven by the preponderance of the evidence. Regardless, it is without question that an employer may move for summary judgment based on the Faragher/Ellerth defense as evidenced by numerous cases that have affirmed summary judgment on that basis. See e.g. Jones v. Se. Pa. Transp. Auth., 796 F.3d 323, 329 (3d Cir. 2015); Crawford v. BNSF Ry. Co., 665 F.3d 978, 983 (8th Cir. 2012); Helm v. Kansas, 656 F.3d 1277, 1279 (10th Cir. 2011); Chaloult v. Interstate Brands Corp., 540 F.3d 64, 66 (1st Cir. 2008); Thorton, 530 F.3d at 458; Collette v. Stein-Mart, Inc., 126 F. App'x 678, 683 (6th Cir. 2005).

are taught how to report discrimination and harassment. (Id. ¶ 18). Finally, it is undisputed that Morgan attended harassment and discrimination training, that she is aware of Triumph's non-discrimination policy, and that she knows how to report harassment. (Id. ¶¶ 19-22).

Morgan argues that Triumph "buried [her] complaints by simply undertaking a cursory investigation, to the point where in reality nothing was done[.]" (Doc. No. 70 at 13). The summary judgment record, however, shows otherwise. In fact, even when Morgan did not complain about discriminatory or retaliatory actions, Triumph took remedial action that resolved the matter.

When Morgan complained about Criss screaming at her about the approval or disapproval of parts, Jordan-Taylor intervened by telling Criss to be patient and give Morgan more instruction. Jordan-Taylor then followed-up with Morgan over the next several months to see if she had further problems with Criss. Morgan reported none.

When Morgan complained about Booker telling her she did not belong and blocked her exit off the jig, Jordan-Taylor told Morgan that she would talk to Booker. Thereafter, Morgan had no further issues with Booker.

When Morgan complained about Ray approaching her in the parking lot, Bowden intervened and walked Morgan into the building. Bowden also claims to have talked to Ray and told him that Morgan did not want to be bothered by him. Morgan does not set forth any facts that suggest Ray has since approached or harassed her, and he has been moved to another line where he works some 200 yards away from Morgan.

"Title VII is designed to encourage the creation of antiharassment policies and effective grievance procedures," Ellerth, 524 U.S. at 764, and "the *raison d'etre* for the Faragher/Ellerth defense is to reward employers who implement and execute" such policies, Primm v. Auction Broad. Co., LLC, 2012 WL 13930, at *8 (M.D. Tenn. Jan. 4, 2012). See Huff v. Sheahan, 493 F.3d 893,

18

900 (7th Cir. 2007) (stating that the Faragher/Ellerth defense "encourages all parties involved to take appropriate steps to avoid harm, consistent with the purposes of the statute"); Perry v. AutoZoners, LLC, 954 F. Supp. 2d 599, 612 (W.D. Ky. 2013) (observing that "the Supreme Court intended the Faragher/ Ellerth affirmative defense to encourage the promulgation of an effective antiharassment policy by allaying an employer's exposure where it had generated such a policy"). Because Triumph has established its entitlement to the Ellerth/Faragher defense, summary judgment on Morgan's hostile work environment claims is appropriate, even assuming that she had been able to establish that Triumph's workplace was permeated with discriminatory intimidation, ridicule, and insult that altered the conditions of her employment and created an abusive working environment.

## IV. Conclusion

On the basis of the foregoing, Triumph's Motion for Summary Judgment will be granted and Morgan's claims will be dismissed.

An appropriate Order will enter.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE